# In the United States Court of Federal Claims

No. 08-558 T
Filed August 26, 2009
NOT FOR PUBLICATION

|  |  |
|---|---|
| ROBERT L. and NANCY G. GOURLEY, | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| THE UNITED STATES, | ) ) ) |
| Defendant. | ) ) ) |

Charles D. Harrison, Eagleton, Eagleton & Harrison, Inc., Tulsa, Oklahoma, for plaintiffs.

Fredrick C. Crombie, Attorney of Record, John A. DiCicco, Acting Assistant Attorney General, Steven I. Frahm, Chief, Court of Federal Claims Section, Mary M. Abate, Assistant Chief, U.S. Department of Justice, Washington, D.C., for defendant.

**OPINION AND ORDER**

Plaintiffs Robert and Nancy Gourley filed suit in this court seeking a refund of their 2000 taxes, arguing that they were victims of the WorldCom fraud and that WorldCom issued Robert Gourley a fraudulent W-2 upon which his tax was erroneously assessed. Because the material facts are not in dispute, and the Court concludes that plaintiffs' arguments are without legal merit, it will grant defendant's motion for summary judgment.

**I.   Background**[1]

      Robert L. Gourley was employed by WorldCom, Inc. from approximately 1995 through 2000 as a scientist in the engineering department. Def.'s Proposed Findings of Uncontroverted Fact (docket entry 12-7, Apr. 17, 2009) ("Def.'s Proposed Findings"); Plaintiffs' Response and Objection to Defendant's Motion for Summary Judgment at 2 (docket entry 15, June 10, 2009) ("Pls.' Opp."). As part of his compensation for that employment, Mr. Gourley received certain nonqualified stock options, as follows:

| Grant Date | Number of Shares Granted | Exercise Price |
|---|---|---|
| 7/3/1995 | 13,500 | $27.00 |
| 1/2/1996 | 6,000 | $35.75 |
| 1/23/1997 | 20,000 | $26.00 |
| 3/10/1997 | 1,200 | $26.00 |

Def.'s Proposed Findings at 2; Exs. 1-4 to Def.'s Mot. For Summary Judgment (docket entry 12, Apr. 17, 2009) ("Def.'s Mot.").

      Mr. Gourley exercised these options on January 28, 2000, and he now maintains that he made this choice because "Mr. Ebbers, Mr. Sullivan, other officers, and management regularly represented how profitable the company was and how valuable its stock was," and "[t]he financial statements of WorldCom showed increasing earnings and Mr. Ebbers projected increasing company profits and stock values for the future." Pls.' Opp. at 2. Because the stock itself had split multiple times between the grant of the options and his exercise date, he was able to purchase a greater number of shares at lower purchase prices than stated in the option agreements. Def.'s Proposed Findings of Fact at 2; Ex. 5 to Def.'s Mot. at 19.

---

[1] The facts set forth herein do not constitute findings of fact by the Court. They are undisputed except where noted and are drawn principally from the following documents and their accompanying exhibits: (1) Defendant's Motion For Summary Judgment (docket entry 12, Apr. 17, 2009); (2) Plaintiffs' Response and Objection to Defendant's Motion for Summary Judgment (docket entry 15, June 10, 2009); and (3) Defendant's Proposed Findings of Uncontroverted Fact (docket entry 12-7, Apr. 17, 2009).

| Grant Date | Number of Options Exercised | Exercise Price | Cost of Exercise |
|---|---|---|---|
| 7/3/1995 | 40,500 | $9.00 | $364,500.00 |
| 7/1/1996 | 18,000 | $11.9167 | $214,500.60 |
| 1/23/1997 | 30,000 | $17.3334 | $520,002.00 |
| 3/10/1997 | 1,800 | $17.334 | $31,201.20 |

*Id.* In total, Mr. Gourley chose to utilize his stock options to purchase 90,300 shares of WorldCom stock for a total exercise price of $1,130,203.80. Def.'s Proposed Findings of Fact at 2; Ex. 6 to Def.'s Mot. at 26.

At the time Mr. Gourley purchased the shares of WorldCom, WorldCom issued a "Stock Option Analysis" detailing the ramifications of three different methods of exercising the options. Ex. 6 to Def.'s Mot. The first method was to "Exercise and Sell," meaning that Mr. Gourley could have simply exercised all of the options and immediately sold the shares he received on the open market for the prevailing price. *Id.* Under this scenario, Mr. Gourley would use the proceeds of the sale to pay the cost of exercising the options and the federal and state income taxes, leaving over $1.5 million to be paid directly to him in cash. *Id.*

Alternatively, Mr. Gourley could have chosen to "Exercise and Sell to Cover." Had he done so, he would have exercised all of the options, but only sold enough of the shares he received to pay the taxes and the cost of exercising the options. This transaction would have resulted in Mr. Gourley's holding 40,323 shares free and clear of obligation. *Id.*

The remaining course of action was to "Exercise and Hold." This alternative—the one Mr. Gourley actually chose—involved exercising all of the options and keeping all of the 90,300 shares he obtained. It was then Mr. Gourley's responsibility to pay the costs of exercising the options and the federal and state taxes incurred. *Id.*; *see also* Ex. 5 to Def.'s Mot. at 19. Mr. Gourley paid $1,922,344.00 in costs of exercise and taxes on the option transactions, most or all of which he obtained through a loan from the Bank of Oklahoma, N.A. Ex. 5 to Def.'s Mot. at 21; Ex. 7 to Def.'s Mot.; Pls.' Opp. at 2 ("In order to exercise these options, [Mr. Gourley] borrowed nearly $2 million from the Bank of Oklahoma. . . .").

Due to the "exercise and hold" manner in which he exercised his options, on January 29, 2000, Mr. Gourley owned 90,300 shares of WorldCom stock, purchased in part through a loan, though the Bank of Oklahoma held the stock as security on the loan. Gourley Decl. at ¶ 8. Beginning on March 1, 2000, the Gourleys' WorldCom stock was sold.[2]

---

[2] Plaintiffs assert that the Bank of Oklahoma "forced" the sale of the WorldCom stock "primarily to pay for interest on the debt." Pls.' Opp. at 6-8.

| Date | Number of Shares Sold | Sale Price |
|---|---|---|
| 3/1/2000 | 500 | $45.4375 |
| 3/22/2000 | 2,000 | $44.125 |
| 5/30/2000 | 500 | $45.375 |
| 8/21/2000 | 700 | $35.125 |
| 1/30/2001 | 86,600 | $22.50 |

By January of 2001, therefore, the Gourleys had sold all of the WorldCom stock they obtained through Mr. Gourley's stock options. When Mr. Gourley received his year 2000 W-2 form from WorldCom it stated that his WorldCom income had been $2,690,414.97 (which reflected, in part, the exercise of the stock options), and Mr. Gourley states that W-2 was the "largest Form W-2 of my life." Gourley Decl. at ¶ 10. Mr. Gourley "sold and liquidated assets, including my retirement accounts, and borrowed additional funds necessary to pay the balance of the federal tax liability." Gourley Decl. at ¶ 11. In total, plaintiffs reported a taxable income of $2,787,885.37 and tax liability of $1,076,670.40, with withholdings of $788,585.63. The Gourleys thus calculated that they owed the Government $288,084.80 in year 2000 taxes. Ex. 13 to Def.'s Mot. The Government assessed slightly more, an additional $2,259.14, for a total tax due of $290,343.94. Ex. 14 to Def.'s Mot. Plaintiffs paid $100,000 at the time they filed their 2000 tax return, and made periodic payments on the remainder, completing the payments in May of 2004. Ex. 14 to Def.'s Mot. at 65-70.

On June 25, 2002, after plaintiffs had sold all of their WorldCom stock and had begun installment payments to the IRS on the taxes due, WorldCom announced a major restatement of its financials. *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 635 (S.D.N.Y. 2004); Ex. 14 to Pls.' Mot. at 65. It was ultimately revealed that from 2000 to 2001, while WorldCom had been reporting profits, it actually incurred losses that it concealed through fraudulent accounting. *See* Ex. 2 to Pls.' Opp. (article by Tim Richardson in the March 15, 2004 edition of the UK Register); Ex. 3 to Pls.' Opp. (summary of Report of Investigation by the Special Investigative Committee of the Board of Directors of WorldCom, Inc., dated March 31, 2003). The revelation of this fraud caused severe losses in the value of WorldCom stock, and litigation followed. *See In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628 (S.D.N.Y. 2004); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392 (S.D.N.Y. 2003); *S.E.C. v. WorldCom, Inc.*, 273 F. Supp. 2d 431 (S.D.N.Y. 2003); U.S. Charges Ex-WorldCom CEO Bernard Ebbers: Former WorldCom CFO Scott Sullivan Pleads Guilty, Press Release, Department of Justice, March 24, 2004 ("When the truth about WorldCom's operations and finances began to be revealed in June 2002, its stock price plummeted, falling more than 90 percent and erasing more than $2 billion in shareholder value, according to the charges.").

On October 13, 2004, plaintiffs filed an amended return for tax year 2000, seeking a refund of $1,091,324 in income taxes and $38,768 in excess Medicare tax plus penalties and interest.[3] Ex. 15 to Def.'s Mot. The explanation accompanying the amended return stated that "Mr. and Mrs. Gourley have overpaid their federal income tax for the year 2000. The W-2 information provided to Robert Gourley by his then employer WorldCom, Inc. was incorrect and that entity has since ceased operations. The W-2 should have included WorldCom, Inc. stock that Mr. Gourley received from WorldCom, Inc. upon the exercise of nonqualified incentive stock options at $12.52 per share." Ex. 15 to Def.'s Mot. at 76. Plaintiffs' position was that "[t]he value of the options was reported in error on the W-2 and the company has gone out of business since the issuance of the W-2." *Id.* at 93. The IRS selected the Gourleys' amended tax return for further examination. Exs. 16 & 17 to Def.'s Mot.

Plaintiffs contended to the IRS that they were entitled to a refund of the federal income tax they paid for tax year 2000 because WorldCom was manipulating its books in 2000. Ex. 18 to Def.'s Mot. at 109 (citing *Culp v. Comm'r*, T.C. Memo 1989-517 and *United States v. Cartwright*, 411 U.S. 546, 551 (1973)). Therefore "[t]he W-2 is based on the value that WorldCom put on the WorldCom stock that WorldCom sold to Robert, and which WorldCom knew to be false. Robert Gourley did not receive the benefit identified on the W-2. WorldCom falsely assigned that value to the stock, at a time when it was actively engaged in the manipulation of the price of that stock, knowing that it had $48.9 billion in losses. Had Robert known any of these relevant facts, he never would have exercised the options." *Id.*

---

[3] When plaintiffs purchased the stock in 2000, they paid income tax on the difference between the exercise price (an average of $12.52 per share) and the market value (an average of $42.125 per share). Their refund claim is, however, premised on the theory that on the date they purchased it, the stock was actually worth only $12.52, rather than $42.125. When they sold some of the stock in the year 2000, they only paid short term capital gains tax on the difference between $42.125 (*i.e.*, their basis in the stock) and the sales price. On their original year 2000 return, the short term capital gains resulting from sales in that year were only $1,769.77. But when the Gourleys amended their 2000 return on the theory that the stock was worth only $12.52, that change also increased the difference between the value of the stock and what they sold it for. So on their amended return, when they changed the basis from $42.125 to $12.52, the amount of their capital gains increased from $1,769.77 to $111,308.00, and short term capital gains tax had to be paid on that larger amount. See Def.'s Mot. at 9 n.6. However, the bulk of the stock was sold in 2001, when the Gourleys' return reported a capital loss on the sale. If—consistent with their refund theory—the Gourleys had utilized $12.52 as their basis in the WorldCom stock sold during tax year 2001, defendant asserts they would have had a capital gain of $864,268 upon which they would then have owed capital gains tax. *Id.* The plaintiffs agree with this assertion and have stipulated that any refund for the year 2000 would have to be offset by "any tax properly due in 2001 or future years consistent with the year 2000 refund claim." Pls.' Opp. at 18.

The IRS disallowed the claim for refund on June 7, 2006. Ex. 19 to Def.'s Mot. As it pertains to the alleged misstatement of the value of the plaintiffs' stock on the W-2 relating to the eventual collapse of WorldCom, the IRS stated that "In a non-qualified option, there may be two taxable events. The first is when the option is exercised: the employer receives a deduction for an amount equal to the amount the employee includes in gross income. If the employee receives stock as a result of the option, there is a second taxable event when the employee ultimately disposes of the stock: the subsequent sale of the stock will be treated as a long-term capital gain or loss, or short-term capital gain or loss, depending on the holding period of the stock." Ex. A to Ex. 20 to Def.'s Mot. at 129. Thus, "[t]he value of the stock was fixed as of the date the exercise occurred. Events that occurred subsequent to the date of exercise do not affect this taxable event [or] the total amount of compensation to be reported." *Id.* The IRS concluded that:

> The Gourleys are relying on events that were discovered subsequent to the date of exercise in an effort to diminish the then-market value of what Gourley received on the date he exercised his options, thus giving rise to a refund. There is no provision in the Code under which this would be allowed. The market determined the value of the stock on the date of exercise, not WorldCom or WorldCom executives. Whether there was malfeasance on the part of WorldCom executives which resulted in an artificial valuation of the company is an issue best taken up between claimants and WorldCom. The alleged malfeasance, however, did not change what the market was willing to pay for a share of stock on the date Gourley exercised his options. The value of what Gourley received when he exercised his options was fixed on January 28, 2000. Therefore, the exercise of his options resulted in a taxable event, measured on a given date. The subsequent rise or decline in the value of stock held by Gourley results in a capital gain or loss once he disposes of the stock, and the disposition of the stock is a separate taxable event. If Gourley has not disposed of the stock, then there has not been a taxable event and no capital gain or loss has occurred . . . . WorldCom executives' wrong-doing following Gourley's exercise of the options is irrelevant to his tax liability associated with the exercise of non-qualified compensatory stock options in 2000.

*Id.*

The Gourleys protested that finding and requested an appeals conference. Exs. 20 & 21 to Def.'s Mot. They "strongly disagree[d] with the findings reached by the IRS" because "the value of the [WorldCom] stock, which they did not actually receive on the date of exercise [because it was held by the Bank of Oklahoma], was not as [WorldCom] represented it to be on the W-2 that [WorldCom] issued to Robert for the year 2000. This transaction is different from stock purchased on the open market by a nonrelated investor. [WorldCom] has admitted to all of the factual underpinnings associated with the issuance of the false W-2 to Robert Gourley, all of which occurred **prior to** the exercise of the options by Mr. Gourley, as established by the government." Ex. 20 to Def.'s Mot. at 118-19 ("So it is disingenuous for the government to

suggest that Robert Gourley has not presented evidence of the false value on his W-2 where it is the government who has proved it, as well as the fact that the fraudulent accounting and stock price manipulation took place prior to the date of exercise."). In a supplemental statement on March 21, 2007, plaintiffs argued that courts had established that WorldCom stock was of negligible value on their option exercise date in January of 2000. Ex. 22 to Def.'s Mot. (citing *S.E.C. v. WorldCom, Inc.*, Civ. No. 02-4963 (S.D.N.Y.) and *In re WorldCom, Inc. Sec. Litig.*, Civ. No. 02-3288 (S.D.N.Y.)). In August of 2007, the IRS notified plaintiffs that the claim for refund would not be allowed. Compl. ¶ 8.

On August 5, 2008, plaintiffs filed their complaint in this court (docket entry 1). The complaint asserts that "[t]he W-2 that WorldCom issued to Robert L. Gourley for the year 2000 . . . was incorrect and grossly inflated" because "WorldCom had been fraudulently inflating the alleged value of its stock through fraudulent accounting entries and fraudulent financial statements for years," and that "Defendant also knew that WorldCom's stock price had been fraudulently manipulated and inflated by WorldCom . . . . [a]t the time Plaintiffs filed their 2000 claim for refund with Defendant." *Id.* ¶ 9. Plaintiffs sought a refund of $1,091,324.00 in income tax, plus interest and penalties, along with a refund of $38,768.00 in Medicare taxes arising out of the same allegedly incorrect W-2. *Id.* ¶ 12.

## II.   Standard of Review

In a tax refund case, the burden is on the taxpayer to overcome the presumption that the IRS Commissioner's assessment is correct and to establish entitlement to the claimed overpayment. *United States v. Janis*, 428 U.S. 433, 440-41 (1976); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). In order to do so, the taxpayer must present "substantial evidence as to the wrongfulness of the Commissioner's determination" to meet the burden of going forward. *KFOX, Inc. v. United States*, 510 F.2d 1365, 1369 (Ct. Cl. 1975). Even if this burden is met, the taxpayer still bears the burden of persuasion. *Esposito v. United States*, 70 Fed. Cl. 558, 563 (2006). Thus, a plaintiff must both come forward with enough evidence to support a finding contrary to the Commissioner's determination and then still carry the ultimate burden of proof. *Transamerica Corp. v. United States*, 902 F.2d 1540, 1543 (Fed. Cir. 1990).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c) of the Rules of the Court of Federal Claims; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that will affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In this case, the fundamental facts are not in dispute—the parties disagree only as to the legal import of those facts, namely, whether a later disclosure of fraud or material misstatements by a corporation can cause a retroactive re-valuation of publicly traded stock for tax purposes.

**III.    Analysis**

Plaintiffs characterize their case as one of "employee fraud perpetrated upon Robert Gourley by his then employer WorldCom . . . wherein Mr. Gourley was induced to exercise employee stock options by the false representations of his employer and erroneously pay income and medicare taxes from a false W-2 issued by that employer." Pls.' Opp. at 2.[4] Although the fraud was not revealed until at least 2002, plaintiffs assert that "WorldCom knew when it issued its 2000 Form W-2 to Mr. Gourley that the benefit that he purchased from WorldCom under its employee stock option [plan] was not the value of the benefit he received" and the Government's claim that "it can rely upon a fraudulent valuation which it knows to be false simply because it was not determined by a Court of law until a later date is repugnant to the fair administration of tax law, and is erroneous as a matter of law." Pls.' Opp. at 14-15.

Plaintiffs are not the first, nor will they be the last, purchasers of stock who later discover that they have received less than they hoped. But they possessed the same information that was available to the public when they bought this publicly traded stock and both they and the public knew what the stock sold for on that date. When a stock has a market value, that is generally the "fair" valuation for tax assessment purposes. *Amerada Hess Corp. v. Comm'r,* 517 F.2d 75, 83 (3d Cir. 1975); *see also id.* at 84 ("The better view is that the market does provide the best evidence of value, notwithstanding a depressed state, or even a large-scale manipulation, of the market as a whole. Market cycles and susceptibilities are, after all, part of the risk which the trader assumes and which is one of the determinants of value."). There are certain limited

---

[4] Mr. Gourley's own declaration casts some doubt upon this assertion; he chose to accept another job, and if he did not exercise the options when he did, he would have lost them "forever." *Compare* Ex. 3 to Pls.' Opp., Decl. of Robert Gourley ("Gourley Decl.") at ¶ 6 ("In late January 2000, I decided to accept a job offer outside WorldCom. The terms of my stock options required me to exercise them before my employment ended or lose them forever."); *with id.* at ¶ 12 ("But for the representations of Mr. Ebbers and officers of WorldCom, I would not have exercised my WorldCom employee stock options, nor held the stock represented by those employee benefits."). The choice Mr. Gourley faced was to exercise the options and take whatever he could get, or forfeit them and gain nothing from this portion of his compensation. It is more likely that it was Mr. Gourley's choice to "exercise and hold" that was affected by WorldCom's alleged misrepresentations rather than his decision to exercise the options at all. *See* Pls.' Opp. at 6 ("Based on the fraudulent representations of WorldCom and its officers as to the value of the employee benefits, Mr. Gourley relied upon those representations and exercised and held."); *id.* ("The loan was necessary to allow Mr. Gourley to exercise his employee stock options in a manner that would allow him to act in accordance with the representations of WorldCom and its officers."); *id.* at 13 ("In reliance on his employer's representations as to the value of this stock, Mr. Gourley did not sell it on the date of exercise. He held it pursuant to the representations made by WorldCom's officers and managers."). Given the Court's construction of the applicable law, however, it is unnecessary for the Court to resolve the factual issue of Mr. Gourley's motivation for exercising the options.

exceptions to the fair market value rule, such as when "the stock was not sold on any exchange, or because the stock valued was part of a large block of stock, or because the stock price was artificially controlled by a syndicate." *Johnson v. Comm'r*, 74 T.C. 89, 96 (1980). The cases cited by plaintiffs deal with these exceptions. *Morton v. Comm'r*, T.C. Memo 1997-166 (value of unlisted stock); *Culp v. Comm'r*, T.C. Memo 1989-517 (market price of "over-the-counter" stock not traded on a formal exchange manipulated through non-arms-length transactions and fraudulent transactions).

But none of those situations pertain here. There was an active market for WorldCom stock, the stock to be valued was not an oversized block relative to the total shares, and the stock price was not artificially controlled by any syndicate engaging in fraudulent or non-arms-length transactions. It is true that the market price was based upon imperfect information, but that does not change the value at which stock was actually traded on January 28, 2000. *Polack v. Comm'r*, 366 F.3d 608, 612 (8th Cir. 2004) (noting that "[i]nformation the hypothetical willing buyer could not have known is obviously irrelevant" to fair market value) (quoting *First Nat'l Bank of Kenosha v. United States*, 763 F.2d 891, 894 (7th Cir. 1985)).

Even when the corporation engages in a "deliberate, massive fraud" that conceals the true circumstances of the business, the price at which the stock could be bought and sold on a public exchange on the valuation date remains the fair value of the stock—even if the stock recipient is an employee of the company. *Horwith v. Comm'r*, 71 T.C. 932, 938-39 (1979). For example, in *Estate of Wright v. Commissioner*, 43 B.T.A. 551 (1941), the decedent owned shares of preferred and common stock in a company that were valued at $47 1/8 (preferred) and $14 (common) on the date of her death. The estate argued that tax should not be paid on that market value because "these prices were the result of misrepresentations and concealments of which purchasers and sellers on the Exchange were at that time unaware." *Id.* at 555 ("Petitioner insists that the market value could not have been fair if based upon general misconception as to the underlying facts."). The Board of Tax Appeals rejected this argument because it would require disregarding a "universally accepted market price, the result of numerous transactions in which the general public freely participated" simply because "more than two years later concealed facts were disclosed which, had they been known, might have created a different market from that which the facts show actually existed." *Id.* at 556 ("If it were always necessary to discover whether every material fact was known to the public before stock exchange prices could be relied upon in fixing fair market value, and indeed to determine what factors are and what are not material in the operations of the whole body of the trading public, it would, we think, be impossible for administrative officers or taxpayers to make an intelligent approximation of their own situation.").

In *Horwith*, the vice-president and secretary-treasurer of Mattel, Inc., exercised qualified stock options he obtained as part of his employment. Mattel later revealed that its financial statements had been "deliberately false and misleading" and the former employee sued for a tax refund, alleging, *inter alia*, that the W-2 he received that included income from exercising those options did not accurately reflect the stock's value. *Horwith*, 71 T.C. at 935-37. Relying upon

*Wright*, the Tax Court rejected Horwith's argument, holding that the fair market value on the date of exercise was a proper valuation. *See also Johnson*, 74 T.C. at 95-96 (even when employees pled *nolo contendere* to criminal accusations, "it is immaterial whether the officers did in fact misrepresent the earnings and profits of the corporation; in any event, the fair market value of the Mattel stock is to be based on prices for which such stock was sold on the NYSE").

Like Mr. Horwith and Mr. Johnson, who were both employees of Mattel, Mr. Gourley, an employee of WorldCom, exercised stock options to purchase WorldCom stock that had a known market value. That market value forms the basis for his tax liability, regardless of later revelations of misrepresentations, fraud and concealment by the company itself. The fact that the stock was purchased from WorldCom pursuant to an employee stock option plan does not affect the valuation. *Johnson*, 74 T.C. at 95-96; *Horwith*, 71 T.C. at 938-39.

Plaintiffs also imply that because the Bank of Oklahoma held their stock, they never actually "received" it and thus the date of the option exercise cannot be the valuation date. Pls.' Opp. at 2. The use of the stock as collateral for a margin loan does not affect the valuation date because when the plaintiffs converted their contingent right to stock (the stock option) into actual stock, WorldCom thereafter possessed no ability to revoke Mr. Gourley's right to the stock. The stock was therefore "substantially vested" for taxation purposes at the time the options were exercised. *Palahnuk v. United States*, 475 F.3d 1380, 1383-84 (Fed. Cir. 2007).

### Conclusion

Because there is no genuine issue as to any material fact and because the Government is entitled to a judgment as a matter of law, defendant's motion for summary judgment is **GRANTED**. The Clerk shall enter judgment for defendant, with no costs to be assessed.

**IT IS SO ORDERED.**

  s/ George W. Miller  
GEORGE W. MILLER  
Judge